Filed 10/15/21  North Coast Rivers Alliance v. Dept. of Food and Agriculture CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| NORTH COAST RIVERS ALLIANCE et al., | C086957 |
| Plaintiffs and Respondents, | (Super. Ct. Nos. 34-2015-80002005 CUWMGDS, 34-2016-80002424 CUWMGDS, 34-2017-80002594 CUWMGDS) |
| v. | |
| DEPARTMENT OF FOOD AND AGRICULTURE et al., | |
| Defendants and Appellants. | |
| | |
| ENVIRONMENTAL WORKING GROUP et al., | |
| Plaintiffs and Appellants, | |
| v. | |
| DEPARTMENT OF FOOD AND AGRICULTURE et al., | |
| Defendants and Respondents. | |

1

The California Department of Food and Agriculture (the Department) is tasked with preventing the introduction and spread of injurious plant pests (Food & Agr. Code, §§ 401, 403), and its pest prevention and management activities are covered by pest-specific California Environmental Quality Act (CEQA) documents. In 2014, when the Department implemented a Statewide Plant Pest Prevention and Management Program, it certified an environmental impact report (EIR) that provided a consolidated set of management practices and mitigation measures. The program EIR is an overarching environmental document discussing reasonably foreseeable activities to be carried out under the statewide program. We will refer to the project for which the program EIR was prepared as the Program and to the Department's pre-existing pest prevention and management activities as ongoing activities.

Two groups of petitioners sought writs of mandate challenging the program EIR: (1) North Coast Rivers Alliance, Pesticide Free Zone, Inc., Health and Habitat, Inc., Californians for Alternatives to Toxics and Gayle McLaughlin (the NCRA petitioners), and (2) Environmental Working Group, City of Berkeley, Center for Food Safety, Pesticide Action Network North America, Beyond Pesticides, California Environmental Health Initiative, Environmental Action Committee of West Marin, Safe Alternatives for Our Forest Environments, Center for Biological Diversity, Center for Environmental Health, Californians for Pesticide Reform and Moms Advocating Sustainability (the EWG petitioners). Certain NCRA petitioners also sought writs of mandate challenging addenda to the program EIR. The petitions were asserted against the Department and its Secretary (collectively the Department Appellants).

The trial court granted the writ petitions in part, ordering the Department to set aside its certification of the program EIR and approval of the Program and addenda. The trial court enjoined further activities under the Program until the Department certifies an EIR correcting the CEQA violations identified in the trial court's ruling.

2

The Department Appellants now contend (1) the program EIR's tiering strategy and checklist comply with the requirements for assessing whether an activity to be carried out under the Program is adequately examined in the program EIR; (2) the Department need not file a notice of determination whenever it approves or decides to carry out an activity it determines is within the scope of the program EIR; (3) the program EIR properly incorporates ongoing activities into its baseline and the baseline need not include unreported pesticide use data; (4) BIO-CHEM-2 and WQ-CUM-1 are proper mitigation measures; (5) the program EIR's discussion of the organic pesticide and no pesticide alternatives is adequate; (6) the addenda to the program EIR properly rely on mitigation measures BIO-CHEM-2 and WQ-CUM-1; and (7) the injunction order is not supported by necessary findings.

In addition, the Department and the EWG petitioners (8) challenge the trial court's rulings regarding the program EIR's discussion of potential significant impacts on non-special status pollinators such as bees, native habitats and their species, wetlands, groundwater, sediment toxicity and certain categories of people; impacts of dichlorvos and carbaryl; cumulative impacts on impaired surface waters and of other pesticide use activities; and chemicals that are "generally regarded as safe." The EWG petitioners also contend (9) the program EIR improperly characterizes mitigation measures as program features. And the NCRA petitioners argue (10) the program EIR's project description is inadequate and the addenda to the program EIR fail to address increased impacts on greenhouse gas emissions, air quality and noise and to provide additional mitigation measures for increased impacts on water quality and certain animals.

We conclude (1) the trial court correctly determined that the program EIR's tiering strategy and checklist violate CEQA; (2) Public Resources Code section 21108[1] requires

_____

[1] Undesignated statutory references are to the Public Resources Code.

3

the Department to file a notice of determination when it approves or decides to carry out an activity under the Program and when the Department concludes no new environmental document is required under CEQA; (3) while we reject most of the NCRA and EWG petitioners' contentions regarding the program EIR's baseline, we agree the baseline is inaccurate because it significantly understates existing pesticide use; (4) BIO-CHEM-2 does not improperly defer formulating mitigation for impacts on special-status wildlife species, WQ-CUM-1 is not a mitigation measure, and the program EIR fails to provide mitigation for potential significant impacts when there are discharges to impaired waterbodies; (5) the program EIR is adequate in discussing the organic-pesticide and no-pesticide alternatives to the Program; (6) with regard to the addenda to the program EIR, we adopt our conclusions in (4) above; (7) the Department Appellants forfeited their claim that the trial court failed to make certain findings in its injunction order; (8) the program EIR fails to (a) provide mitigation measures for potential significant impacts on pollinators, (b) state facts supporting the conclusion that the Program's contribution to the cumulatively significant impact on impaired waterbodies would not be considerable, and (c) adequately analyze cumulative impacts, but we reject the other claims by the Department Appellants and EWG petitioners regarding the program EIR's discussion of potential significant environmental impacts; (9) the EWG petitioners fail to show that any mischaracterization of mitigation measures as Program features hindered the Department or the public's ability to understand the Program's significant environmental impacts and measures to mitigate those impacts; and (10) because the NCRA petitioners did not file an appeal or cross-appeal, their claims are forfeited.

We disagree with the trial court's conclusions that the program EIR fails to do the following: identify which of the Department's ongoing activities were included in the baseline, describe the amount of pesticides associated with ongoing Department activities, disclose figures for unreported pesticide use and adequately discuss the no-pesticide and organic-pesticide alternatives. We also disagree with the trial court's

4

conclusions that the Department has a demonstrated ability to estimate unreported pesticide use based on sales data, that the Department erred in not considering impacts on non-special status pollinators, and that mitigation measure BIO-CHEM-2 improperly defers the formulation of mitigation measures.

We granted leave to the California Farm Bureau Federation and the California Citrus Mutual to file amicus curiae briefs in support of the Department Appellants and have considered the amicus curiae briefs and the NCRA petitioners' responses thereto. We deny as irrelevant the California Farm Bureau Federation's request for judicial notice. (Cal. Rules of Court, rule 8.252(a)(2)(A) [a request for judicial notice must state why the matter to be noticed is relevant to the appeal]; *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [only relevant material may be judicially noticed], overruled on another point in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1275-1276.)

We will reverse the judgments in part and affirm them in part and direct the trial court to enter new judgments consistent with this opinion and issue new peremptory writs of mandate.

BACKGROUND

The Program includes reasonably foreseeable pest prevention, management and regulatory activities to be carried out or overseen by the Department against specific injurious pests throughout the state and provides a framework of management practices and mitigation measures for those activities. After releasing a draft program EIR for public review and comment, the Department certified a final program EIR. It determined that the Program will have a significant effect on the environment and adopted a statement of overriding considerations.

The NCRA petitioners filed a writ petition and complaint in Sacramento County Superior Court, and the EWG petitioners filed a writ petition and complaint in Alameda

5

County Superior Court, both challenging the certification of the final program EIR. The parties stipulated to transfer the EWG action to Sacramento. Certain NCRA petitioners then filed writ petitions challenging the approval of addenda Nos. 1 and 2 to the program EIR. For simplicity we also refer to those petitioners as the NCRA petitioners. The trial court consolidated all of the actions.

The trial court ultimately ruled in favor of the petitioners on several issues and granted petitioners' request for peremptory writs of mandate, ordering the Department to set aside its certification of the program EIR and approval of the Program and addenda. The trial court enjoined further chemical activities to control or eradicate pests under the Program, except as authorized under CEQA documents independent of the program EIR, unless the Department corrects the CEQA violations the trial court had identified.

The Department Appellants appeal from the judgments entered in favor of the NCRA and EWG petitioners. The EWG petitioners cross-appeal. The NCRA petitioners did not file a notice of appeal.

This court stayed the trial court's judgments. We also stayed the appeals in Case Nos. C088935, C088565, and C088388 -- appeals of the award of fees and costs relating to the challenges to the program EIR and addenda -- pending resolution of the appeal in this case.

STANDARD OF REVIEW

We review the Department's decision to certify the program EIR for prejudicial abuse of discretion. (§ 21168.5; *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 (*Sierra Club*).) Abuse of discretion is established if the Department has not proceeded in a manner required by law or if its determination is not supported by substantial evidence. (§ 21168.5.) We are not bound by the trial court's conclusions. (*Center for Sierra Nevada Conservation v. County of El Dorado* (2012) 202 Cal.App.4th 1156, 1172-1173 (*Center for Sierra Nevada Conservation*).) Thus, we determine

6

de novo whether the Department employed the correct procedure and whether the program EIR's discussion of environmental impacts, mitigation measures, alternatives, baseline conditions and other required information is adequate. (*Sierra Club,* at pp. 512-516; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).) But we review the Department's factual determinations for substantial evidence. (*Sierra Club,* at p. 516; *Vineyard,* at p. 435.)

We presume the program EIR is adequate and review the sufficiency of the document in light of what is reasonably feasible, looking not for perfection but for adequacy, completeness and a good faith effort at full disclosure. (Cal. Code Regs., tit. 14 (hereafter Guidelines), § 15151; *In re Bay-Delta Programmatic Environmental Impact Report Coordinated Proceedings* (2008) 43 Cal.4th 1143, 1175 (*In re Bay-Delta*); *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740 (*Al Larson*).) The NCRA and EWG petitioners bear the burden of proving that the program EIR is legally inadequate or that insufficient evidence supports its conclusions and that the failure to comply with CEQA resulted in prejudice, i.e., that the omission of relevant information precluded informed decision-making and informed public participation. (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924-925 (*Rialto*); *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1197-1198.)

DISCUSSION

I

The Department Appellants challenge the trial court's conclusion that the program EIR's tiering strategy and checklist violate CEQA.

The Legislature encourages the tiering of EIRs whenever feasible. (§ 21093, subd. (b); Guidelines, §§ 15006, subds. (f), (m), 15152, subd. (b).) Tiering refers to the coverage of general matters and environmental effects in an overarching EIR, with the

7

preparation of subsequent EIRs or negative declarations on issues specific to later activities. (§ 21068.5; Guidelines, §§ 15152, subd. (a), 15385, 15371.) A program EIR like the one involved here uses tiering. (Guidelines, § 15152, subd. (h)(3)); *In re Bay-Delta, supra,* 43 Cal.4th at p. 1170.)

When an agency certifies a program EIR and carries out a site-specific activity under the program, it should use a written checklist to document its evaluation of the site and activity to determine whether the environmental effects of the activity were adequately addressed in the program EIR or whether an additional environmental document must be prepared. (Guidelines, §§ 15152, subd. (f)(3), 15168, subd. (c)(4), 15361.) If the activity would have significant environmental effects that were not examined or adequately addressed in the program EIR, the agency must prepare an initial study that leads to a subsequent EIR or negative declaration. (§ 21094, subd. (c); Guidelines, § 15168, subd. (c)(1); *In re Bay-Delta, supra*, 43 Cal.4th at p. 1173; see § 21166.) If the agency determines that no new effects could occur or no new mitigation measures would be required, the agency can approve the activity as being within the scope of the project covered by the program EIR and no new environmental document is required. (§ 21094, subds. (a), (b); Guidelines, §§ 15162, 15168, former subd. (c)(2); *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 55-56 (*Committee for Green Foothills*).) Such a determination need not be made in a public process. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 238-239 (*Center for Biological Diversity*).)

Here, the program EIR adopts a tiering strategy and checklist, but the "yes" or "no" questions in Appendix C, Part A do not ask whether the program EIR discusses the potential significant impacts the proposed activity may have on the environment at the site where the proposed activity will occur. (Cf. Guidelines, § 15168, subd. (c)(4) [recommending use of checklist to determine whether the environmental effects of the operation were covered in the program EIR].) Part B also does not require such a

determination. Part C requires an assessment of whether the proposed activity will result in potentially significant impacts which were not considered in the program EIR, not considered to be significant in the program EIR, or would be substantially more significant than disclosed in the EIR. However, a decision-maker is directed to proceed to Part C only when the responses to questions posed in Part A include a "no."

The Department Appellants claim that Department staff must conduct a site assessment pursuant to applicable management practices. But the tables in Part B do not require a site assessment for most types of Program activities. And staff members are not required to assess whether a proposed activity would have significant impacts at a particular site which are different from what was analyzed in the program EIR. While the Department Appellants urge that some mitigation measures require site-specific analysis, the mitigation measures do not require staff to determine whether the program EIR adequately addresses a significant environmental impact or whether additional environmental review is required.

The Department Appellants also claim that reviewing the databases referenced in the "Activity Site-Specific Review" section of the checklist constitutes site-specific review. But the guidelines provide no instructions for the "Activity Site-Specific Review" section of the checklist, nothing in the tiering strategy and checklist indicates whether the "Activity Site-Specific Review" section requires staff to assess the extent to which site-specific impacts are addressed in the program EIR, and the Department Appellants do not cite any portion of the record supporting their assertion. (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 (*Nwosu*).)

*Center for Biological Diversity*, a case the Department Appellants cite, is factually distinguishable. That case involved a program EIR for the Department of Fish and Wildlife's program of stocking trout, salmon and steelhead at about 1,000 locations in the state. (*Center for Biological Diversity, supra*, 234 Cal.App.4th at pp. 224-225.) The program EIR recommended the use of an evaluation protocol to assess whether stocking

9

may significantly impact a decision species, i.e., a species identified as vulnerable to harm from stocking, at a location. (*Id.* at pp. 229, 235-236.) The agency would cease stocking if a decision species was present at a location until it developed and implemented an aquatic biodiversity management plan for the location. (*Ibid.*) In contrast to the evaluation protocol in *Center for Biological Diversity*, the tiering strategy and checklist here do not require staff to consider whether there are site-specific environmental impacts and whether the program EIR adequately analyzed such impacts.

The Department Appellants insist the program EIR considers potential treatment settings and provides detailed and comprehensive analysis. But even if the program EIR provides detailed and comprehensive analysis, the tiering strategy and checklist violate CEQA because they permit the Department to carry out a proposed activity without determining whether the proposed activity would have more significant or different potential significant environmental effects than were covered in the program EIR and, thus, whether an additional environmental document must be prepared under CEQA. (§ 21094, subds. (a)-(c); Guidelines, §§ 15152, subds. (d), (f), § 15168, former subd. (c).)


II

The Department Appellants next argue that, contrary to the trial court's conclusion, when a proposed activity is within the scope of the program EIR, it is part of the project previously noticed and analyzed and not a separate project for which a new notice of determination is required under section 21108.

Section 21108 broadly provides that a state agency must file a notice of approval or determination with the Office of Planning and Research if the state agency approves or determines to carry out a project that is subject to CEQA. (§ 21108, subd. (a).) Section 15094, subdivision (a) of the Guidelines likewise requires a lead agency to file a notice of determination when it decides to carry out or approve the project. The term project is given a broad interpretation under CEQA " 'to maximize protection of the

environment.' " (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 730 (*San Joaquin Raptor*); see also *Center for Sierra Nevada Conservation, supra*, 202 Cal.App.4th at p. 1170.)  As relevant here, "project" is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is . . . [a]n activity directly undertaken by any public agency." (§ 21065, subd. (a); Guidelines, § 15378, subd. (a)(1).)  Neither section 15378 of the Guidelines nor section 21065 of CEQA excludes subsequent activity undertaken under a program EIR from the definition of project.  And the obligation to file a notice of determination in section 21108, subdivision (a) is not limited to a new or separate project. *Committee for a Progressive Gilroy v. State Water Resources Control Bd*. (1987) 192 Cal.App.3d 847, a case the Department Appellants cite, is inapposite because it does not discuss whether a notice of determination must be filed under section 21108 or section 15168 of the Guidelines.

The Department Appellants argue in their appellate reply brief that the Legislature intended the phrase "approves or determines to carry out" in section 21108 to "bring both public and private project approvals within CEQA, not to expand the definition of 'project' to include activities implementing a project that has already undergone environmental review."  The Department Appellants ask us to take judicial notice of documents they admit were not presented to the trial court.  We deny the request for judicial notice and do not consider the belated arguments because they were raised for the first time in a reply brief without a showing of good cause for failing to present them in the opening brief. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10; *North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, 679 (*Kawamura*).)

We conclude, based on the language of section 21108, that when the Department approves or determines to carry out an activity as being within the scope of the Program and concludes that no new environmental document would be required under CEQA because the significant environmental effects of the activity are adequately covered in the

11

program EIR, the Department must comply with section 21108, subdivision (a).  Our conclusion is consistent with the purpose to be served by the filing of a notice of determination:  to alert the public about environmental decisions.  (*Committee for Green Foothills, supra*, 48 Cal.4th at p. 43; see Guidelines, §§ 15002, subds. (a)(1), (a)(4), 15003, subd. (e).)  Our conclusion is also consistent with language in *Committee for Green Foothills*.  (*Committee for Green Foothills,* at pp. 43, 55-56.)  In that case, the California Supreme Court said CEQA requires public agencies to publicly notice determinations that supplemental environmental review is not required for an activity carried out pursuant to a program.  (*Id.* at p. 43 [citing section 21108].)  The Supreme Court explained that the general rule requiring an agency to file a notice of determination whenever it approves or determines to carry out a project that is subject to CEQA requires an agency to file a notice of determination when it concludes that an activity is within the scope of a program EIR and requires no further environmental review.  (*Id.* at pp. 54-56.)

III

The Department Appellants also argue that the program EIR properly incorporates ongoing activities into its environmental baseline and the baseline need not include unreported pesticide use data.

Typically, the baseline for environmental analysis is the existing conditions of the environment at time the environmental analysis is performed.  (Guidelines, § 15125, former subd. (a); *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 445, 455 (*Neighbors for Smart Rail*).)  "[A]n agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence."  (*Communities for a Better Environment v. South Coast Air Quality Management Dist.*

12

(2010) 48 Cal.4th 310, 328 (*Communities for a Better Environment*); see also *Association of Irritated Residents v. Kern County Bd. of Supervisors* (2017) 17 Cal.App.5th 708, 727-729.) Including the impacts of an existing project in the baseline is consistent with CEQA when a project is ongoing. (*World Business Academy v. California State Lands Company* (2018) 24 Cal.App.5th 476, 501-503; *Center for Biological Diversity, supra*, 234 Cal.App.4th at pp. 248-252; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 658-659 (*San Joaquin Raptor Rescue Center*).)

The EWG petitioners assert, consistent with the trial court's ruling, that the program EIR fails to specify what ongoing activities are included in the baseline. But, as the Department Appellants explain, the program EIR considers ongoing activities part of the environmental baseline and ongoing activities are those subject to prior CEQA documents -- namely, activities relating to the Japanese Beetle, gypsy moth, exotic fruit fly, Pierce's Disease, and light brown apple moth. Table 5-15 of the program EIR identifies past, existing, and future pesticide use by the Department. The program EIR adequately explains what ongoing activities are part of the environmental baseline.

The trial court ruled that the program EIR fails to describe the amount of pesticides associated with ongoing Department activities. The NCRA petitioners now argue that, in defining the baseline, the program EIR must distinguish between pesticides used in the Department's ongoing activities and pesticides used independent of the Department's direction and oversight. But the NCRA petitioners fail to explain why the program EIR must isolate pesticide use attributable to the Department's ongoing activities to understand the environmental impacts of and alternatives to the Program. The comparison must be between existing physical conditions without the Program and the conditions expected to be produced by the Program. (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 328.) The approach the Department adopted in the program EIR permits the required comparison.

13

The cases the NCRA petitioners cite are factually distinguishable and do not hold that a lead agency must distinguish between effects of its ongoing activities and effects of other existing activities. The program EIR does not use hypothetical or maximum-allowed pesticide use as the baseline. (Cf. *Communities for a Better Environment, supra*, 48 Cal.4th at pp. 317-318, 326.) In addition, the program EIR does not use a future conditions baseline. (Cf. *Neighbors for Smart Rail, supra*, 57 Cal.4th at pp. 451-452.)

The trial court concluded that the program EIR should have disclosed figures for unreported pesticide use and the Department has a demonstrated ability to estimate unreported pesticide use based on sales data. The NCRA petitioners say the Department could have summarized the existing sales data in the program EIR and stated that reported sales totals likely exceed actual use.

The program EIR discloses that although approximately 619 million pounds of pesticide active ingredients were sold in 2011, not all use must be reported, and only about 192 million pounds of pesticide active ingredients were reported as being used in the state in 2011. The program EIR informs the reader that in general about two-thirds of the pesticide active ingredients sold in a given year are not subject to use reporting, and sales data does not necessarily reveal pesticide use because some pesticides may not be used in the year purchased. The NCRA petitioners do not explain how the statement it proposes would have given the reader a better understanding of the actual existing pesticide use when the program EIR already states that sales data, while available, does not necessarily reflect the total pesticide used.

Like the trial court, the EWG petitioners assert that the Department had a demonstrated ability to estimate unreported pesticide use, but they do not explain how the Department could have accomplished that task. (*Nwosu, supra,* 122 Cal.App.4th at p. 1245, fn. 14 [the failure to present argument with references to the record and citation to legal authority results in a forfeiture]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*) [when an appellant fails to support a point with reasoned argument

14

and citations to authority, it is forfeited].)  The Department disclaims that it demonstrated an ability to calculate unreported use from sales data.  And we cannot discern from the record that there was available data from which the Department could develop an estimate of the amount of pesticides used but not reported.

Citing section 15144 of the Guidelines, the EWG petitioners further argue that the Department has an obligation to forecast the amount of unreported pesticide use.  But it is proper for the Department to disclose that it could not determine the amount of unreported pesticide use in the program EIR and explain the reason that data for unreported use is not provided in the EIR.  (See Guidelines, § 15145; *Vineyard, supra*, 40 Cal.4th at pp. 434, 446.)  CEQA requires a lead agency to investigate and provide only information it can reasonably obtain at the time the EIR is prepared.  (See Guidelines, § 15145; *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 17 Cal.App.5th 413, 440 (*Cleveland National Forest Foundation*).)

In any event, we agree with the EWG petitioners that the program EIR's baseline significantly understates existing pesticide use.  The program EIR discloses that typically, at most only about one-third of the pesticide active ingredients sold and used in a given year is reported.  Inasmuch as a significant portion of pesticide used in the state in 2011 is not included in the baseline conditions for the program EIR, the baseline is not an accurate description of the existing physical conditions and, consequently, does not provide a reliable assessment of the environmental consequences of the Program. (See *Cleveland National Forest Foundation, supra,* 17 Cal.App.5th at pp. 444-445.) The Department Appellants argue, without elaboration and citation to the record or authority, that even if the program EIR underestimates the baseline level of pesticides used by excluding unreported use, the program EIR overstated incremental impacts from pesticide use.  We do not consider the unsupported claim.  (*Nwosu, supra,* 122 Cal.App.4th at p. 1245, fn. 14; *Badie, supra,* 67 Cal.App.4th at pp. 784-785.)

15

IV

The Department Appellants also challenge the trial court's rulings regarding mitigation measures BIO-CHEM-2 and WQ-CUM-1.

A

The trial court ruled that mitigation measure BIO-CHEM-2 improperly defers the formulation of mitigation measures by providing that a treatment plan will be developed in the future to avoid or minimize substantial adverse effects. The Department Appellants challenge the ruling, arguing that a treatment plan to minimize substantial effects is sufficient mitigation. We agree with the Department Appellants.

"Formulation of mitigation measures should not be deferred until some future time." (Guidelines, § 15126.4, former subd. (a)(1)(B) [effective through December 27, 2018].) However, "when, for practical reasons, mitigation measures cannot be fully formulated at the time of project approval, the lead agency may commit itself to devising them at a later time, provided the measures are required to 'satisfy specific performance criteria articulated at the time of project approval.' " (*Rialto, supra*, 208 Cal.App.4th at p. 944, italics omitted; see also Guidelines, § 15126.4, former subd. (a)(1)(B); *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 418 (*Laurel Heights*); cf. *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 281; *San Joaquin Raptor Rescue Center, supra*, 149 Cal.App.4th at pp. 670-671.)

The program EIR identifies chemical management activities that could result in potentially significant impacts on special-status species. Site-specific mitigation measures for impacts on special-status species could not be formulated at the time of project approval because as the program EIR explains, Program activities may occur anywhere pest infestations occur in the state. Mitigation measure BIO-CHEM-2 aims to avoid or minimize substantial adverse effects on, or the taking of, special-status species. It provides that the Department would first determine whether an area to be treated may contain suitable habitat for special-status wildlife species. If such habitat exists, the

16

Department would obtain technical assistance from the U.S. Fish and Wildlife Service, the California Department of Fish and Wildlife and the National Marine Fisheries Service to prepare treatment plans. As in *Center for Biological Diversity,* the program EIR commits the Department to mitigating impacts before treatment begins and informs the Department what it must do and accomplish. (*Center for Biological Diversity, supra*, 234 Cal.App.4th at pp. 243-245.) BIO-CHEM-2 does not improperly defer formulating mitigation measures.

The NCRA petitioners argue that under BIO-CHEM-2, site-specific evaluations will not be subject to public review. But deferring the formulation of the details of a mitigation measure is permitted when the agency adopts specific performance standards the mitigation will achieve, commits itself to mitigation, and identifies the types of potential actions that can feasibly achieve the performance standards. (Guidelines, § 15126.4, subd. (a)(1)(B); *Rialto, supra,* 208 Cal.App.4th at pp. 944-945.)

B

The Department Appellants also challenge the trial court's conclusion that mitigation measure WQ-CUM-1 merely requires the Department to implement appropriate management practices, which are program features, and does nothing to reduce the significance of potential impacts on impaired waterbodies. We agree with the trial court's conclusions.

Under WQ-CUM-1, the Department must determine whether a treatment location or quarantine area contains or is near any impaired waterbody before conducting a treatment or implementing a quarantine, and it must implement Program management practices during the Program activity when an impaired waterbody is present. The Department must implement mitigation measure WQ-CHEM-5, requiring regulated parties to comply with Program management practices, when a quarantine area contains or is near an impaired waterbody.

17

As drafted, Program management practices are a feature of the Program. The program EIR requires the Department to implement Program management practices during Program activities, regardless of the presence of impaired waterbodies. A measure that is part of the project is not a mitigation measure. (*Cleveland National Forest Foundation, supra*, 17 Cal.App.5th at p. 433.) Because the use of Program management practices is a feature of the Program, WQ-CUM-1 is not a mitigation measure.

The program EIR concludes without discussion that implementation of Program management practices would avoid or minimize discharges to impaired waterbodies. It does not describe feasible measures to mitigate potential cumulative significant impacts when discharges to impaired waterbodies occur, even though it recognizes that any additional contribution of pesticides or toxic substances by Program activities to impaired waterbodies would be a considerable contribution to a cumulative significant impact. (§ 21100, subd. (b)(3); Guidelines, § 15126.4, subd. (a)(1).) Accordingly, the program EIR does not comply with the CEQA requirement that the EIR describe feasible measures that could minimize significant effects program activities could have on the environment. (§ 21100, subd. (b)(3); Guidelines, § 15126.4, subd. (a)(1); see § 21081, subd. (a); Guidelines, § 15091, subd. (a).)

The Department Appellants appear to argue in their appellate reply brief that the Department deferred formulating mitigation measures for cumulative impacts to impaired waterbodies. But the program EIR does not state that mitigation measures for cumulative impacts to impaired waterbodies could not be fully formulated at the time of project approval, nor does it articulate a performance criteria that future mitigation measures must satisfy, and there is no statement that the Department will devise mitigation measures at a later time. (*Rialto, supra,* 208 Cal.App.4th at pp. 944-945.)

18

V

The Department Appellants challenge the trial court's conclusion that the program EIR's analysis of the no pesticide and organic pesticide alternatives is inadequate.

The trial court concluded that the program EIR should have included details about the Department's ongoing activities and described how the no pesticide and organic pesticide alternatives would affect those ongoing activities. We agree with the Department Appellants' challenge to these conclusions. The program EIR describes the Department's ongoing activities, including the insecticides used in those activities. The program EIR explained that the Department would not use pesticides under the no pesticide alternative and would only use natural pesticide products or synthetic pesticide products that are specifically allowed under Title 7, Part 205.601 of the Code of Federal Regulations under the organic pesticide alternative.

With regard to the no pesticide alternative, the trial court said the Department should have described the amount and type of pesticides currently being applied. The NCRA petitioners raise a similar argument in their appellate brief. An EIR must consider alternatives to the proposed project and include sufficient information to allow comparison of the alternative and the proposed project. (§ 21100, subd. (b)(4); Guidelines, § 15126.6, subds. (a), (d).) Under the no pesticide alternative, the Department would not use the conventional pesticides proposed to be used under the Program. The program EIR identifies the conventional pesticides to be used under the Program and discusses the potential significant environmental impacts of using those pesticides. The program EIR explains that under the no pesticide alternative, the environmental effects of using conventional pesticides under the Program would be avoided. That discussion was sufficient to compare the Program with a no pesticide alternative.

With regard to the organic pesticide alternative, the trial court concluded the Department should have described the extent to which organic pesticides might be used

19

in place of conventional pesticides or identified those pests for which there is no alternative to conventional pesticides. But the program EIR described the pest management activities allowed under the organic pesticide alternative. It said only natural pesticide products or approved synthetic pesticide products were allowed to be used under this alternative. It identified the pests that could not be effectively controlled and eradicated under the organic pesticide alternative and said that populations of those pests are expected to grow and spread under the organic pesticide alternative.

Citing *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692 (*Kings County Farm Bureau*) and *Laurel Heights, supra*, 47 Cal.3d 376, cases involving project-level and not program EIRs, the NCRA petitioners argue the program EIR must provide a quantitative comparative analysis of the no pesticide and organic pesticide alternatives. (*Kings County Farm Bureau,* at p. 706; *Laurel Heights,* at pp. 387-389.) The cases the NCRA petitioners cite do not hold that a quantitative comparative analysis of alternatives is required in all cases. The NCRA petitioners fail to show that the Department must provide the type of quantitative comparison they demand. We do not address the NCRA petitioners' further contentions because the trial court did not make findings on the particular points the NCRA petitioners raise.

VI

According to the trial court, to the extent the addenda to the program EIR rely on the mitigation measures in the program EIR to reduce risks to a less-than-significant level, the addenda suffer from the same flaws as the program EIR. Reiterating the arguments addressed in part IV of this opinion regarding mitigation measures BIO-CHEM-2 and WQ-CUM-1, the Department Appellants argue the addenda to the program EIR properly rely on the program EIR's mitigation measures. For reasons we have stated, mitigation measure BIO-CHEM-2 does not improperly defer the formulation of

20

mitigation measures for impacts on special-status wildlife species, but the program EIR fails to provide mitigation for potential significant impacts on impaired waterbodies.

## VII

The Department Appellants next contend that the injunction order is not supported by necessary findings.

The Department Appellants objected to the injunction order in the trial court, but not on the grounds raised on appeal. They have, therefore, forfeited this appellate claim. (Civ. Code, § 3516; *Araiza v. Younkin* (2010) 188 Cal.App.4th 1120, 1127.) While a party may raise a new issue on appeal if that issue involves a question of law on undisputed facts (*ibid.*), the issue the Department Appellants now raise requires resolution of factual issues that were not developed in the trial court.

## VIII

The Department Appellants and the EWG petitioners challenge the trial court's rulings regarding the program EIR's discussion of the Program's potential significant environmental impacts.

### A

The EWG petitioners contend the Department failed to analyze the scenarios identified in Table 6.3-4 of the program EIR in relation to significant impacts on pollinators. But Table 6.3-4 in the program EIR identifies scenarios from the use of chemicals that could result in risk exceeding the level of concern for six control targets. The program EIR's Ecological Risk Assessment discusses the chemicals used, manner of application and settings of use for each of the six control targets and describes the toxicity of the chemicals listed in Table 6.3-4 to the surrogate species selected for study, including bees. It further discusses the potential for adverse effects from use of the chemicals listed in Table 6.3-4 on insects, such as bees, and other animals.

21

Also in relation to pollinators, the Department Appellants defend the program EIR's focus on special-status pollinators, challenging the trial court's ruling that the program EIR improperly focuses on potential significant impacts on special-status pollinators and fails to consider potential adverse impacts on non-special status pollinators. Contrary to the trial court's conclusion, the Department's decision to use special-status pollinator species to assess potential impacts of pesticide use on pollinators is supported by substantial evidence. The program EIR explains that it is not feasible to assess the risk to all species that may be present where Program activities might occur because the geographic area of potential Program activities is large and varied; the Department selected native and special-status species whenever possible as surrogate species to represent the suite of potentially affected species. The program EIR need only evaluate a particular environmental impact to the extent it is reasonably feasible to do so. (*Cleveland National Forest Foundation, supra*, 3 Cal.5th at p. 512.) Appendix K explains why the program EIR addresses potential impacts on special-status pollinators. The discussion in the program EIR and Appendix K is substantial evidence supporting the Department's decision to focus on special-status pollinator species. (Guidelines, § 15121, subd. (c).)

Nevertheless, we agree with EWG that the program EIR fails to mitigate potential significant adverse impacts on bees. The program EIR discloses that use of pesticides for Program activities could harm bees, which are non-special status pollinators. The program EIR's Ecological Risk Assessment and Appendix K likewise state that pesticides can poison bees. Appendix K further notes sublethal impacts to bees from pesticides, including reducing the foraging success of bees. Because the program EIR discloses that Program activities could have substantial adverse impacts on bees, it must discuss mitigation measures for those impacts and the program EIR does not do so. (§ 21002.1, subd. (b); see also Guidelines, § 15021, subd. (a).)

The program EIR concludes that although certain chemicals to be used in the Program could have potential significant effects on pollinators, such effects would be less than significant because the Department would implement avoidance and minimization measures discussed in Chapter 2 of the program EIR and Attachment 1 to Appendix K of the program EIR. We review an agency's conclusion that mitigation measures identified in the EIR will reduce the adverse effects of the project for substantial evidence. (*Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1306.) The program EIR does not explain how the management practices in Chapter 2 would minimize the potential adverse impacts on bees. (Guidelines, § 15126.4, subd. (a)(1)(B) [EIR must discuss basis for selecting a particular mitigation measure].) Attachment 1 to Appendix K describes actions the Department says it already takes and will take under the Program to benefit pollinators. But the attachment does not explain how the proposed actions to benefit pollinators would avoid or mitigate the potential significant effects of Program activities on bees. The Department's statement in the program EIR that implementation of enumerated measures would reduce or avoid potential impacts on bees, without facts or analysis, is inadequate. (*Sierra Club, supra*, 6 Cal.5th at p. 522.)

B

The Department Appellants claim substantial evidence supports the program EIR conclusion of no cumulative impacts on impaired surface waters.

The program EIR concludes that with the implementation of Program management practices, the transport of pesticides to waterbodies via aerial drift or runoff would unlikely occur. In response to comments to the draft program EIR, the Department said it found that with implementation of Program management practices, the contribution of Program pesticides to the impaired water bodies would not be detectable and, therefore, would not be a considerable contribution to a cumulative impact. No facts supporting the Department's assertions are provided. The Department must identify facts supporting its conclusion that the Program's contribution to a cumulative impact will be less than

23

considerable. (Guidelines, § 15130, subd. (a).) Unsubstantiated opinion or narrative is not substantial evidence supporting a conclusion of no significant impact. (§ 21080, subd. (e); Guidelines, §§ 15064, subd. (f)(5), 15384, subd. (a); *Californians for Alternatives to Toxics v. Department of Food & Agriculture* (2005) 136 Cal.App.4th 1, 13 ["[T]he EIR should set forth specific data, as needed to meaningfully assess whether the proposed activities would result in significant impacts."]; *Kings County Farm Bureau, supra*, 221 Cal.App.3d at pp. 729-730.)

The program EIR makes other related unsupported assertions. It states that in agricultural settings where chemicals would be applied, Program management practices or label restrictions would likely prevent chemicals from reaching waterbodies. The section on Impact WQ-CHEM-5 states that based on fate and transport mechanisms, the concentrations of chemicals in waterbodies from Program activities are expected to be substantially lower than the estimated concentrations modeled in the Ecological Risk Assessment. The program EIR states that Program management practices, manufacturer's specifications, and the National Pollutant Discharge Elimination System permit that covers the use of carbaryl, a chemical that may exceed water quality thresholds based on conservatively modeled concentrations, "would be likely to not cause carbaryl concentrations from Proposed Program activities to exceed regulatory thresholds despite the conservative model estimates." No facts supporting the above predictions and expectations are included. The program EIR's conclusions about the Program's contribution to the cumulatively significant impact on impaired waterbodies do not comply with CEQA.

The program EIR is deficient for another reason. It states that impaired waterbodies "have no further assimilative capacity for the listed chemicals, and any discharges would further impair conditions." "Therefore, any additional contribution by the . . . Program to an impairment would be a considerable contribution to a cumulatively significant impact." Based on those statements, minimizing discharges to impaired

24

waterbodies or reducing the concentration of chemicals discharged to impaired waterbodies would not render the Program's contribution to the cumulatively significant impact on impaired waterbodies not considerable. The analysis in the program EIR does not lead to the conclusion of no cumulative impact on impaired waterbodies.

In a related claim, the EWG petitioners contend that to overcome an overly conservative model showing a potential significant impact, the Department conducted a qualitative analysis in violation of CEQA's information disclosure requirement. But the argument is forfeited as not supported by citation to authority. (*Nwosu, supra,* 122 Cal.App.4th at p. 1245, fn. 14; *Badie, supra,* 67 Cal.App.4th at pp. 784-785.) We also reject the EWG petitioners' claim that the program EIR fails to evaluate Program activities that could impact waterbodies. The program EIR discusses the impacts on water quality which could result from pesticides and other chemicals that may be used in Program activities.

C

The Department Appellants also challenge the trial court's ruling that the discussion of cumulative impacts in the program EIR is deficient because it does not provide sufficient information about other pesticide programs. We agree with the trial court's assessment.

An adequate discussion of significant cumulative impacts must include (1) a "list of past, present, and probable future projects producing related or cumulative impacts, including, if necessary, those projects outside the control of the agency" or (2) a "summary of projections contained in an adopted local, regional or statewide plan, or related planning document, that describes or evaluates conditions contributing to the cumulative effect." (Guidelines, § 15130, subd. (b)(1).) The discussion must also include a "summary of the expected environmental effects to be produced by those projects with specific reference to additional information stating where that information

25

is available, and [¶] . . . [a] reasonable analysis of the cumulative impacts of the relevant projects."   (Guidelines, § 15130, subd. (b)(4), (5).)

The program EIR recognizes that the cumulative risk to ecological receptors and human health from Program activities "would depend on the pesticide chemicals used, other chemical additives used, how a pesticide is applied, where pesticide use occurs, the quantity and concentration of the pesticides applied, exposure pathways, and the biological characteristics of the receptor."  The same factors would be relevant to determining the cumulative impacts of Program activities on other aspects of the environment, but the portions of the program EIR the Department Appellants cite in support of their contention that the program EIR adequately evaluated the Program's cumulative impacts do not contain information about the factors the program EIR acknowledges are relevant.  For example, Table 5-15 in the program EIR identifies the past, existing and future pesticide use activities in the geographic range of the Program, including programs maintained by the Department, other state agencies and federal agencies, but does not specify the application methods involved, the treatment areas or the quantity and concentration of pesticides applied.  The portions of the program EIR the Department Appellants cite also do not contain information from which the public and the Department could determine whether any potential adverse environmental impacts of Program activities would be cumulatively considerable when added to those of other pesticide programs.  (*San Joaquin Raptor, supra*, 27 Cal.App.4th at p. 740 [cumulative impacts discussion was inadequate where other development projects were not listed and adequately discussed]; *Kings County Farm Bureau, supra*, 221 Cal.App.3d at p. 723 [finding EIR inadequate where the agency could not determine whether air pollution from all projects in the San Joaquin Valley air basin would have revealed a more severe impact because the EIR did not provide that data].)

Because we conclude the program EIR's cumulative impacts analysis is inadequate, we do not decide the EWG petitioners' contention that the program EIR's

conclusions regarding cumulative impacts on air quality and hazardous materials is not supported by substantial evidence.

D

According to the EWG petitioners, the program EIR assumes, without evidence, that pesticide spraying will generally occur in areas away from native habitat and fails to analyze impacts on native habitats and their species. They also criticize the program EIR for not defining native habitat and not identifying where such habitat is located.

The portions of the administrative record the EWG petitioners cite do not refer to native habitat. The program EIR states that Program activities would generally "occur in locations of commercial agriculture production (including nurseries), and in residential and urban areas (including ports and airports)" and would not occur in "undeveloped areas of native vegetation, although these natural areas may occur adjacent to locations of Proposed Program activities." To the extent the EWG petitioners' reference to native habitat relates to what the program EIR calls "undeveloped areas of native vegetation," the EWG petitioners fail to establish that the Department's decision to not discuss effects in areas where Program activities will not occur is an abuse of discretion. (See *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 338 [the agency's selection of the geographic area impacted by a project falls within its discretion, based on its expertise]; *Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2004) 123 Cal.App.4th 1331, 1350-1351 [same].)

The portions of the record the EWG petitioners cite also do not support their assertion that many special-status species occur in agricultural, residential and urban areas away from native habitat and that the program EIR does not analyze the impacts of spraying. And contrary to the EWG petitioners' assertion, the program EIR discusses pesticide drift.

27

The EWG petitioners further contend that although the program EIR concludes, without supporting evidence, that Program activities will have no impact, a beneficial impact, or a less-than significant impact on sensitive species, data in the program EIR's Ecological Risk Assessment contradicts that conclusion. We disagree. The discussion regarding Impact BIO-CHEM 2, BIO-CHEM-3 and BIO-CHEM-4 in the pages the EWG petitioners cite discloses that pesticide applications could affect special-status species and pollinators, and that the Ecological Risk Assessment describes scenarios which could result in a risk that could exceed the level of concern for various surrogate species, non-target insects and pollinators. Tables 6.3-2, 6.3-3 and 6.3-4 in the pages cited list those scenarios. The program EIR does not hide the fact that risks exceeding the level of concern may result under certain circumstances.

The EWG petitioners also claim that substantial evidence does not support the conclusion in the program EIR that physical and chemical traps and lures will not have significant impacts on sensitive species. Again, we disagree.

An agency's conclusion that a proposed activity's impact on the environment will not be significant must be based on substantial evidence in the record. (Guidelines, § 15064, subd. (f); *San Francisco Baykeeper, Inc. v. State Lands Commission* (2015) 242 Cal.App.4th 202, 228.) The cited pages explain that traps usually have special designs and colors to focus on the target species; the majority of traps would be used in urban and residential areas where special-status insects are not expected to occur, and the Department was not aware of any special-status invertebrates caught in its traps. The program EIR lists the specific traps and lures proposed under the Program. The Water Quality section describes the chemicals used in traps and lures and explains why the chemicals would not likely be transported to waterbodies. In response to comments to the draft program EIR, the Department said there was no evidence that the traps it used have captured special-status invertebrates and that the conclusions in the program EIR were based on facts relating to trap design and past practice and expert opinion. The

28

Department's response to comments to its draft program EIR is an integral part of the EIR and it is reasonable to expect that decision-makers and the public will consider those responses. (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 516-517 (*Cleveland National Forest Foundation*).) Substantial evidence supports the Program EIR's conclusion that the impacts of traps and lures would be less than significant.

We reject the argument the EWG petitioners raise for the first time in their appellate reply brief that the program EIR fails to analyze impacts of traps on invertebrates generally. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 (*Neighbours*).) We also reject the EWG petitioners' claim that the program EIR does not contain any mitigation measures or other enforceable requirements to prohibit the Department from applying pesticides to native habitats; that claim was also not raised until the reply brief. (*Ibid.*)

E

Although the trial court concluded the program EIR is not defective for assuming that spraying generally will not occur near wetlands and other sensitive natural communities, the EWG petitioners argue the program EIR fails to adequately analyze the Program's potential impacts on wetlands. They say the program EIR fails to explain what the Department considers a wetland or "other aquatic or sensitive natural community," identify the locations of wetlands, and analyze how pesticide drift or runoff could indirectly affect wetlands and how the Program will avoid contributing to pesticide drift and runoff. We disagree.

The program EIR considers the impacts of Program activities on sensitive natural communities including wetlands. Appendix J to the program EIR contains a list of sensitive natural communities in California. The program EIR concludes that Program activities would have no impact on sensitive natural communities because activities would not occur within those communities. The Department explained in response to

29

comments to the draft program EIR that it already avoided discharges to wetlands in its ongoing activities. Its explanation is substantial evidence supporting the no impact conclusion. The EWG petitioners do not point to any portion of the record that shows Program activities would occur in wetlands.

The program EIR discloses that rainfall and snow melt can carry pollutants to wetlands. But the Department explained, in response to comments to the draft program EIR, that the program EIR provides management practices to avoid pesticide drift and runoff and site-specific evaluation would allow the Department to assess potential impacts of pesticide runoff on wetlands. The Department said if impacts are unavoidable or mitigation measures other than those in the program EIR are necessary, the Department would prepare a tiered CEQA evaluation. We reject the argument the EWG petitioners raise for the first time in their appellate reply brief that the program EIR fails to include a mitigation measure requiring the Department to limit Program activities to areas away from wetlands. (*Neighbours, supra,* 217 Cal.App.3d at p. 335, fn. 8.)

F

The EWG petitioners next assert that the program EIR fails to adequately analyze the Program's impacts on groundwater. In particular, they argue that the program EIR (1) fails to consider whether a pesticide or its degradates could infiltrate a groundwater supply; (2) ignores U.S. Geological Service guidance on evaluating pesticide impacts on groundwater; (3) fails to mention the California Department of Pesticide Regulation's groundwater protection regulations (Cal. Code Regs., tit. 3, § 6800 et seq.) and analyze the Program's impacts on groundwater protection areas; (4) does not consider whether any groundwater protection areas could be affected by the Program and what the effects of the Program would be; and (5) fails to evaluate or provide mechanisms to evaluate whether high groundwater tables may be present in an application area or describe where currently contaminated groundwater supplies exist.

30

The trial court did not decide whether the program EIR's analysis of significant impacts on groundwater is adequate. In any event, the program EIR explains that pesticides and pollutants can be transported to groundwater. It assesses groundwater monitoring data for the chemicals that may be used under the Program. It explains that the California Department of Pesticide Regulation and the State Water Resources Control Board maintain comprehensive databases of pesticides in groundwater and that the Department searched the databases for Program pesticide ingredients detected in 2009 to 2014 to assess the potential for exposure to these ingredients via the ingestion of drinking water from both groundwater and surface water sources. Reported ingredient concentrations were compared to corresponding risk-based screening thresholds to evaluate the likelihood of exposure above a level of concern.

The program EIR identified the chemicals that may be used in the Program and that were detected in groundwater in concentrations above a risk-based screening threshold -- methyl bromide, 1,2,4-trimethylbenzene, naphthalene, and xylenes -- and said that the other Program chemicals that are monitored and reported in one or more databases were not detected in groundwater above their respective risk-based screening thresholds. The program EIR explains that methyl bromide would not be transported to groundwater from Program activities because it would be used as a fumigant in above-ground fumigation chambers and sea vans that would not inject the chemical into the soil. Also, any amount of methyl bromide that reaches water would rapidly volatilize into air and would unlikely reach waterbodies. The Department further explained in response to comments to the draft program EIR that fumigation chambers and sea vans are contained environments and there is no mechanism by which methyl bromide could reach groundwater. As for the other chemicals that have been detected in groundwater in concentrations above screening thresholds, the program EIR and responses to comments explained that those chemicals are typically used in the Program at concentrations less than five percent; thus, it is highly unlikely the chemicals attributable to the Program

31

could reach any significant concentrations in groundwater. The above explanations support the conclusion in the program EIR that the contribution, if any, from Program activities with regard to those other chemicals would be de minimus.

The EWG petitioners fail to demonstrate why the program EIR must consider U.S. Geological Service guidance, the California Department of Pesticide Regulation's regulations on groundwater protection, groundwater protection areas, high groundwater tables, and currently contaminated groundwater supplies in order to evaluate the potential impact of Program activities on groundwater. Accordingly, we reject those claims. (*Nwosu, supra,* 122 Cal.App.4th at p. 1245, fn. 14; *Badie, supra,* 67 Cal.App.4th at pp. 784-785.)

G

The EWG petitioners contend the program EIR fails to analyze the Program's impact on sediment toxicity.

The trial court did not conclude whether the program EIR's analysis of significant impacts on sediment toxicity is adequate. But the program EIR's Ecological Risk Assessment considers sediment toxicity. The Human Health Risk Assessment acknowledges that pesticides can collect in sediment in waterbodies. And the program EIR explains that sedimentation can affect water quality. It explains that the State Water Resources Control Board monitors trends in sediment toxicity and discusses the result of that monitoring. The program EIR identifies the chemicals that may be used under the Program that would bind to sediment particles. It discloses that analyses suggest toxicity to invertebrate test species is caused most often by pesticides, and there are increasing concentrations of pyrethroid pesticides in sediments. But the Department described why chemicals that bind to sediments were less likely to produce adverse effects for aquatic invertebrates than dissolved residues.

The EWG petitioners complain that the program EIR does not include sediment quality standards such as the State Water Board's Water Quality Control Plan for

32

Enclosed Bays and Estuaries–Part I Sediment Quality (State Board Resolution 2011-17). But they do not explain how inclusion of such a standard would affect a decision-maker's assessment of sediment toxicity. In response to comments to the draft program EIR, the Department explained that the modeling used to assess sediment toxicity estimated limnetic water column and benthic sediment pore water concentrations, and that benthic pore water concentration was the best predictor of sediment toxicity.

The EWG petitioners also complain that the program EIR does not consider changes in sediment quality that may occur from Program activities. Not so. The Department said in response to comments to the draft program EIR that Program activities would not include any substantial ground disturbances that would cause erosion and would not likely be located in areas susceptible to sedimentation. The program EIR explains that management practices would minimize sediment load increase. The Department said management practices aimed at erosion reduction, existing regulations, and label requirements, render less than significant the potential for Program activities substantially contributing to sedimentation.

H

The EWG petitioners further assert that the program EIR does not discuss the impacts of dichlorvos and carbaryl as Proposition 65 listed toxicants. The claim has no merit.

Table 5-7 of the program EIR shows the amount of dichlorvos and carbaryl, two Proposition 65 pesticides, used in 2011 by county. The program EIR and Human Health Risk Assessment describe dichlorvos and discuss its use under the Program and its potential impacts on the environment. Those documents explain that dichlorvos was detected above its risk-based screening threshold but say its use under the Program is limited to trap and splat applications and such applications are targeted at very small areas; thus, it is not likely that the Program's use of dichlorvos will result in substantial, if any, transport to water. The documents also describe the characteristics of carbaryl and

33

discuss risks associated with use of products containing carbaryl. The program EIR says carbaryl is among the Program chemicals that modeling showed may exceed numeric water quality thresholds but that adherence to the requirements of the Department's National Pollutant Discharge Elimination System permit for biological and residual pesticide discharges would avoid discharge of the chemical into surface waterbodies.

I

The EWG petitioners also criticize the program EIR's classification of certain chemicals as "generally regarded as safe" and say that the program EIR fails to evaluate the impact these chemicals may have on surface waters.

Table 6.7-2 of the program EIR identifies 11 chemicals to be used in the Program that the Department classifies as "generally regarded as safe." The "generally regarded as safe" classification means no information was found during the preparation of the program EIR indicating that the chemicals posed water quality concerns. Contrary to the EWG petitioners' assertion that the list is not exhaustive, the Department clarified in response to comments to the draft program EIR that the water quality impacts section assessed all chemicals considered for use under the Program.

The program EIR says the chemicals in the "generally regarded as safe" category tend to be naturally occurring (although in less concentrated forms) in the environment and/or have properties that make them inert in the environment. Some of the chemicals in this category are not expected to result in concentrations substantially different from background conditions and many of the chemicals would rapidly break down and/or settle out of the water column. The minerals in the category would generally settle to the bottom or wash out of aquatic environments and would not be considered toxic to aquatic life. The oils in the category are typically used in products designated as safe for human contact or consumption and typically degrade rapidly. The remaining chemicals in the category are naturally occurring and degrade "via normal organic degradation processes." In addition, several of the chemicals in the category are bacteria normally found in the

34

environment and increased concentrations would not degrade water quality. No evidence presented during the public comment period for the draft program EIR shows that any of the "generally regarded as safe" chemicals may harm aquatic organisms or cause physical impacts to the environment.

The program EIR further explains that because no numeric thresholds exist for the chemicals in this category, no violation of numeric water quality standards would occur. And the chemicals in the "generally regarded as safe" category are not expected to cause a violation of narrative standards, such as visible oil sheens, impairments of taste and odor, or concentrations great enough to be detrimental to aquatic life, because only a relatively small amount of the chemicals would be used under the Program in any given location. Therefore, the impact would be less than significant.

The EWG petitioners say the program EIR fails to model the concentrations of chemicals it categorizes as "generally regarded as safe" that would reach water bodies; fails to consider impacts on benthic habitat and sediment contamination and that minerals could wash through aquatic environments; fails to provide any concentration modeling of discharges; and presents no information evaluating the effects chemicals may have on aquatic resources. The same arguments were made in response to the draft program EIR and the Department pointed to information in the "Dashboard database" in response to the arguments. We cannot locate the Dashboard database in the appellate record. "Failure to provide an adequate record concerning an issue challenged on appeal requires that the issue be resolved against the appellants." (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 366.)

J

The EWG petitioners next argue that the program EIR fails to adequately analyze health impacts on adults over the age of 40, children under two, and other sensitive populations.

35

The program EIR's Human Health Risk Assessment considers the impacts of pesticide exposure on the health of infants (ages zero to less than two years), children (ages two to less than 16 years), and adults (16 to 40 years). Although the group identified as adults is defined as 16 to 40 years of age, the assessment uses data relating to adults age 50 and older when considering the impacts relating to ingestion of treated vegetation for post-application residents because that data "was more health-protective." The Department also explained in response to comments to the draft program EIR that the Margin of Exposure approach used in the Human Health Risk Assessment provides confidence that sensitive receptors such as the elderly and pregnant women were accounted for. The program EIR explains why children, fetuses and the elderly are at greater risk to exposure to pesticides and describes studies showing links between pesticide exposure and adverse conditions in children, fetuses and the elderly. And the program EIR states that the Department evaluated potential human health risks of Program activities to those sensitive receptors. The program EIR considered human health impacts on children and adults over 40 years.

The EWG petitioners point out that the Human Health Risk Assessment does not consider impacts on individuals with asthma or other chronic illnesses. That is true. But CEQA does not require an analysis to be exhaustive. (Guidelines, § 15151; *Kawamura, supra*, 243 Cal.App.4th at p. 677.) " ' "[A]n EIR need not include all information available on a subject[;]" . . . [all that is required is] sufficient information and analysis to enable the public to discern the analytic[al] route the agency traveled from evidence to action.' [Citation.] 'A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. . . . That further study . . . might be helpful does not make it necessary.' " (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Board of Directors* (2013) 216 Cal.App.4th 614, 639-640.) In reviewing an EIR's discussion, we look for " ' " 'adequacy, completeness and a good-faith effort at full disclosure.' " ' " (*Sierra*

*Club, supra*, 6 Cal.5th at p. 515.) The EWG petitioners fail to show that the program EIR's analysis of human health impacts is misleading or inadequate.

The EWG petitioners further argue the evidence does not support the assumption in the Human Health Risk Assessment that infants spend most of their time indoors and are not active in typically treated areas. But the conclusion that children under two years of age are typically not in areas affected by pesticide applications is reasonably drawn from facts stated in the assessment, i.e., that infants are typically indoors, infants are typically under adult supervision, and the Department always provides advance notice of pesticide applications at a property. Substantial evidence supporting a lead agency's factual determination includes facts and reasonable assumptions predicated upon facts. (§ 21080, subd. (e); Guidelines, §§ 15064, subd. (f)(5), 15384, subd. (b).)

The EWG petitioners further complain that the Human Health Risk Assessment fails to consider the most common exposure pathway for children: contaminated dirt brought into homes on the shoes of residents. But the EWG petitioners fail to show prejudicial error. (See *Al Larson, supra*, 18 Cal.App.4th at pp. 748-749 [appellant must demonstrate prejudice].) The Human Health Risk Assessment assesses exposure pathways believed to result in the highest potential for risk for children: dermal contact with residues from Program pesticide ingredients on plant surfaces and soil; incidental ingestion of residues on vegetation from hand-to-mouth activity; and ingestion of treated produce and soil. The Department explained that because the potential risk to a child demonstrating pica (soil-eating) behavior was assessed in a residential setting and because the pica scenario represents a higher potential health risk, the Human Health Risk Assessment did not quantify the potential risk to a child from incidental ingestion of treated soil through hand-to-mouth contact. The EWG petitioners do not demonstrate that bringing contaminated dirt into homes via residents' shoes poses a greater potential adverse impact on the health of children than the exposure pathways assessed.

IX

Citing *Lotus v. Department of Transportation* (2014) 223 Cal.App.4th 645 (*Lotus*), the EWG petitioners argue the program EIR improperly conceals mitigation measures as Program features.

"The distinction between elements of a project and measures designed to mitigate impacts of the project may not always be clear." (*Lotus, supra,* 223 Cal.App.4th at p. 656, fn. 8.) "Any mischaracterization is significant, however, only if it precludes or obfuscates required disclosure of the project's environmental impacts and analysis of potential mitigation measures." (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 185; see *Lotus,* at p. 658.)

The EWG petitioners argue that the program EIR does not analyze the impacts of pesticide drift, does not impose drift reduction techniques as enforceable mitigation measures, and conceals mitigation measures. But unlike the EIR in *Lotus*, the program EIR here discloses that pesticide drift can cause significant impacts on human health, organic farming, crops, water quality, wildlife habitat and biological resources. It includes Program management practices that minimize drift. The EWG petitioners fail to show that any mischaracterization of mitigation measures as Program management practices hindered the Department or the public's ability to understand the Program's significant environmental impacts relating to pesticide drift and the analysis of measures to mitigate such impacts.

The EWG petitioners also cite pages of the program EIR relating to organic farming, pollinators, hazardous or toxic materials, and water quality, for the proposition that the program EIR concealed mitigation measures as program features. However, the EWG petitioners fail to show that the Department concealed the Program's potential significant environmental impacts on organic farming, pollinators, hazardous materials, water quality, and/or impaired waterbodies. We also do not consider the EWG petitioners' claim that was made without citation to the record in their appellate

38

respondent's brief and cross-appellant's opening brief that the Program management practices are not enforceable. (*Kawamura, supra*, 243 Cal.App.4th at pp. 677-678; *Nwosu, supra,* 122 Cal.App.4th at p. 1246.) The record citations provided in the EWG petitioners' appellate reply brief for this proposition do not support their contention.

X

The trial court ruled that the program EIR's description of the Program is sufficiently detailed for a program-level document, even though the description lacks detailed information about how, when, and where the Program will be implemented in response to particular pest infestations. Although they did not file an appeal or cross-appeal, the NCRA petitioners now argue against that ruling, asserting that the project description improperly omits certain information. The NCRA petitioners further argue that the addenda to the program EIR fail to (1) provide additional mitigation measures to address increased risks to vernal pool andrenid bees, western yellow-billed cuckoos, purple martin, aquatic invertebrates and water quality, and (2) address increased impacts on greenhouse gas emissions, air quality and noise.

" 'As a general matter, " 'a respondent who has not appealed from the judgment may not urge error on appeal.' " [Citation.] "To obtain affirmative relief by way of appeal, respondents must themselves file a notice of appeal and become cross-appellants." [Citations.]' " (*Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 665; see also *Bonfigli v. Strachan* (2011) 192 Cal.App.4th 1302, 1317, fn. 12.) While a respondent who is urging affirmance of a trial court order need not file a cross-appeal to assert that the order is correct on another ground (*Warmington Old Town Associates v. Tustin Unified School Dist.* (2002) 101 Cal.App.4th 840, 864), the NCRA petitioners are not asking us to affirm the portions of the trial court's judgment relating to the project description or analysis of biological impacts and impacts on noise; they are challenging those portions of the judgment. The trial court's order did not address impacts on

greenhouse gas emissions and air quality. We decline to review the NCRA petitioners' claims because they did not file an appeal or cross-appeal and have not shown that review of their contentions is otherwise necessary. (Code Civ. Proc., § 906.)

## DISPOSITION

The judgments are reversed in part and affirmed in part. The trial court is instructed to enter, consistent with this opinion, new and different judgments granting in part and denying in part the consolidated petitions for writ of mandate and to issue new peremptory writs of mandate. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

/S/
MAURO, J.

We concur:


/S/
HULL, Acting P. J.


/S/
RENNER, J.